**LOUIS EPPOLITO**
Reg. No. 04596-748
U.S. Penitentiary Tucson
P.O. Box 24550
Tucson, Arizona 85734

Petitioner pro se

FILED _____ LODGED
RECEIVED _____ COPY

JUL - 3 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

CV18-0324 TUC RM EJM

NO. _____

(Criminal No. 1:05-00192-JBW) (E.D. N.Y.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### TUCSON DIVISION

### LOUIS EPPOLITO,

**Petitioner**

v.

### R. L. RHODES, Acting Warden
### United States Penitentiary Tucson,

**Respondent**

## PETITION FOR A WRIT OF HABEAS CORPUS
### Pursuant to 28 U.S.C. § 2241

## BRIEF OF PETITIONER
### LOUIS EPPOLITO

# TABLE OF CONTENTS

**CASE:**                                                                                                    **PAGE:**

**TABLE OF CONTENTS**..................................................................................................i

**TABLE OF AUTHORITIES**...............................................................ii,iii,iv,v,vi

**ISSUES PRESENTED FOR REVIEW**......................................................1,12,15,18

**STATEMENT OF THE CASE**....................................................................................2

**STATEMENT OF JURISDICTION**......................................................................3,4,5

**STATEMENT OF THE FACTS**.........................................................6,7,8,9,10,11

**REASONS FOR GRANTING THE PETITION**...............................12 through 31

**CONCLUSION**............................................................................................................31

**CERTIFICATE OF SERVICE**.............................................................................32

# INDEX TO APPENDICES/EXHIBITS

**EXHIBIT A:**  Docket Sheet - *U.S. v. Eppolito*, Criminal Case No. 1:05-00192-JBW  (E.D. N.Y.)

**EXHIBIT B:**  Superseding Indictment (S-3) - *U. S. v. Eppolito*, No. 1:05-00192-JBW (E.D. N.Y.)

**EXHIBIT C:**  Transcript of Trial (March 31, 2006) - *U.S. v. Eppolito*, No. 1:05-00192-JBW (E.D. N.Y.)

**EXHIBIT D:**  Plea Agreement /Transcript - *U.S. v. Zappola and Conte*, No. CR–95-31 (FB) (E.D. N.Y.)

**EXHIBIT E:**  Motions Hearing Trans. (June 23, 2006) - *U.S. v. Eppolito*, No. 1:05-00192-JBW (E.D. N.Y.)

**EXHIBIT F:**  Motions Hearing Trans. (June 26, 2006) - *U.S. v. Eppolito*, No. 1:05-00192-JBW (E.D. N.Y.)

**EXHIBIT G:**  Motions Hearing Trans. (June 26, 2006) - *U.S. v. Eppolito*, No. 1:05-00192-JBW (E.D. N.Y.)

**EXHIBIT H:**  Order Denying § 2255 Relief - *Eppolito v. U.S.*, No. 11-CV-5123 (E.D. N.Y., Sept. 11, 2012)

i

**CASE:**                                                                                          **PAGE:**

*Aetna Life Ins. Co. v. Lavoie*

475 U.S. 813, 89 L. Ed.2d 823, 106 S. Ct. 1580 (1986)........................................................12

*Aetna Life Ins. Co. v. Ward*

140 U.S. 76, 88, 35 L. Ed 371, 11 S. Ct. 720 (1891)........................................................30

*Arizona v. Fulminante*

499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed.2d 302 (1991)........................................................13

*Bousley v. United States*

523 U.S. 614, 140 L. Ed.2d 828, 118 S. Ct. 1604 (1998)........................................................4

*Brady v. Maryland*

373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d (1963)........................................................15

*California v. Trombetta*

467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed.2d 413 (1984)........................................................15

*Caperton v. A.T. Massey Coal Co.*

556 U.S. 868, 129 S. Ct. 2252, 173 L. Ed.2d 1208 (2009)........................................................12

*Carriger v. Stewart*

132 F.3d 463, 479-80 (9th Cir. 1997)........................................................4,16

*Chang v. United States*

250 F.3d 79 (2d Cir. 2001)........................................................19

*Coffin v. United States*

156 U.S. 432, 15 S. Ct. 394, 39 L. Ed 481 (1895)........................................................12

*Gideon v. Wainwright*

372 U.S. 335, 344, 9 L. Ed.2d 799, 83 S. Ct. 792 (1963)........................................................18

*Eppolito v. United States*

Case No. 11-CV-5123 (E.D. N.Y.)........................................................11

# TABLE OF AUTHORITIES

**CASE:**                                                                 **PAGE:**

*Giglio v. United States*

405 U.S. 150, 92 S. Ct. 763, 31 L. Ed.2d 104 (1972)........................................................16

*Greenway v. Schriro*

653 F.3d 790, 805 (9th Cir. 2011)........................................................13

*Harris v. New York*

401 U.S. 222, 91 S. Ct. 643, 28 L. Ed.2d 1 (1971)........................................................19

*Harrison* v. *Ollison*

519 F.3d 952, 959 (9th Cir. 2007)........................................................4

*Hernandez v. Campbell*

204 F.3d 861, 865 (9th Cir. 2000) (per curiam)........................................................3

*Hilton v. Braunskill*

481 U.S. 770, 775, 95 L. Ed.2d 724, 107 S. Ct. 2113 (1987)........................................................30

*Hurles v. Ryan*

706 F.3d 1021, 1036-37 (9th Cir. 2013)........................................................12,14

*In re Bonner*

151 U.S. 242, 261, 38 L. Ed 149, 14 S. Ct. 323 (1894)........................................................31

*Ivy v. Pontesso*

328 F.3d 1057 (9th Cir.), cert. denied, 540 U.S. 1051 (2003)........................................................4,5

*Johnson v. Zerbst*

304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed 1461 (1938)........................................................18

*Kyles v. Whitley*

514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed.2d 490 (1995)........................................................15,16

*Lorentsen v. Hood*

223 F.3d 950, 953 (9th Cir. 2000)........................................................4

iii

1

# **TABLE OF AUTHORITIES**

2          **CASE:**                                                                                           **PAGE:**

3          *Luce v. United States*

4          469 U.S. 38, 42, 105 S. Ct. 460, 83 L. Ed.2d 443 (1984)..........................................................28

5          *Mayberry v. Pennsylvania*

6          400 U.S. 465, 91 S. Ct. 499, 27 L. Ed.2d 532 (1971).............................................................12

7          *McQuiggin v. Perkins*

8          133 S. Ct. 1924, 185 L. Ed.2d 1019 (2013)...............................................................................3

9          *Persaud v. United States*

10         134 S. Ct. 1023 (2014)..............................................................................................................5

11         *Powell v. Alabama*

12         287 U.S. 45, 68-69, 77 L. Ed 158, 53 S. Ct. 55 (1932)...........................................................18

13         *Redfield v. United States*

14         315 F.2d 76, 83 (9th Cir. 1963).................................................................................................4

15         *Riggins v. Nevada*

16         504 U.S. 127, 112 S. Ct. 1810, 118 L. Ed.2d 479 (1992)........................................................19

17         *Rock v. Arkansas*

18         483 U.S. 44, 107 S. Ct. 2704, 97 L. Ed.2d 37 (1987).......................................................19,28

19         *Rose v. Clark*

20         478 U.S. 570, 92 L. Ed.2d 460, 106 S. Ct. 3101 (1986).........................................................13

21         *Stanley v. Schriro*

22         598 F.3d 612 (9th Cir. 2008)....................................................................................................15

23         *Stephens v. Herrera*

24         464 F.3d 895 (9th Cir. 2006).....................................................................................................4

25         *Strickland v. Washington*

26         466 U.S. 668, 80 L. Ed.2d 674, 104 S. Ct. 2052 (1984)..............................................14,18,19

27

28                                                                      iv

1

## **TABLE OF AUTHORITIES**

2

**CASE:**                                                                                                     **PAGE:**

3  *Sullivan v. Louisiana*

4  508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed.2d 182 (1993)...........................................................14

5  *Tumey v. Ohio*

6  273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437 (1927)...............................................................12,14

7  *United States v. Bagley*

8  473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed.2d 481 (1985)......................................................15,16

9  *United States v. Barnard*

10  490 F.2d 907, 913 (9th Cir. 1973)..........................................................................................30

11  *United States v. Caracappa*

12  614 F.3d 30 (2d Cir. 2010)......................................................................................................11

13  *United States v. Cronic*

14  466 U.S. 648, 80 L. Ed.2d 657, 104 S. Ct. 2039 (1984).........................................................18

15  *United States v. Eppolito*

16  543 F.3d 25 (2nd Cir. 2008)....................................................................................................10

17  *United States v. Gillenwater*

18  717 F.3d 1070, 1073 (9th Cir. 2013)........................................................................................19

19  *United States v. Joelson*

20  7 F.3d 174, 177 (9th Cir. 1993)................................................................................................19

21  *United States v. Pirro*

22  104 F.3d 297, 299 (9th Cir. 1997)..............................................................................................4

23  *United States v. Scheffer*

24  523 U.S. 303, 313, 140 L. Ed.2d 413, 118 S. Ct. 1261 (1998).................................................29

25  *Williams v. Swarthout*

26  771 F.3d 501, 509 (9th Cir. 2014)............................................................................................12

27

28

v

# TABLE OF AUTHORITIES

**CASE:**                                                                 **PAGE:**

*Withrow v. Larkin*

421 U.S. 35, 43 L. Ed.2d 712, 95 S. Ct. 1456 (1975)..............................................................12

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED:

United States Const. Amend. V

United States Const. Amend. VI

18 U.S.C. § 2                                    21 U.S.C. § 841 (a)

18 U.S.C. § 1956 (a)(3)(B)                       21 U.S.C. § 841 (b)(1)(B)

18 U.S.C. § 1958                                 21 U.S.C. § 841 (b)(1)(B)(viii)

18 U.S.C. § 1962 (d)   ("RICO")                  21 U.S.C. § 846

18 U.S.C. § 3231

18 U.S.C. § 3551

28 U.S.C. § 1291

28 U.S.C. § 2241

28 U.S.C. § 2255

**OTHER:**

Rule 35 of the Fed. R. Crim. P.   (RE: Burton Kaplan receiving substantial assistance)

## ISSUES PRESENTED FOR REVIEW

### GROUND ONE:

**PETITIONER WAS DENIED THE RIGHT TO A FAIR TRIAL IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BASED ON...**

Structural/plain error - the result following the trial judge [Jack B. Weinstein] having found during a hearing on pretrial motions that Mr. Eppolito and Stephen Caracappa "were members of the conspiracy charged from the time it began until the time they were arrested."

### GROUND TWO:

**PETITIONER WAS DENIED DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION BASED ON...**

Government's failure to disclose to the defense material exculpatory evidence in order to charge and convict Mr. Eppolito of crimes that the government knew he did not commit.

### GROUND THREE:

**PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BASED ON...**

Defense counsel's refusal to allow Mr. Eppolito to testify in his own defense at trial, despite his repeated request to do so.

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF THE CASE**

**Introduction**

Petitioner, Louis Eppolito (hereinafter "Mr. Eppolito") is currently incarcerated at United States Penitentiary [USP Tucson] located in Tucson, Arizona - under Judgment and Commitment Order of the United States District Court for the Eastern District of New York in *United States of America v. Stephen Caracappa and Louis Eppolito,* Criminal Case No. 1:05-00192-JBW (S-3)). The superseding indictment in this case (**Exhibit B**) charges Mr. Eppolito with: **Count One,** "Racketeering Conspiracy" in violation of 18 U.S.C. § 1962 (d), with **Racketeering Acts: One,** (Bribery), **Two,** (Bribery), **Three,** (Kidnaping/Murder Conspiracy/Murder/Murder for Hire), **Four,** (Kidnaping Conspiracy/Kidnaping/Murder Conspiracy/Murder), **Five,** (Criminal Facilitation/Murder), **Six,** (Bribery), **Seven,** (Murder Conspiracy/Murder), **Eight,** (Tampering with a Witness, Victim or Informant/Retaliating Against a Witness, Victim or Informant/Criminal Facilitation/Murder), **Nine,** (Obstruction of Justice), **Ten,** (Obstruction of Justice), **Eleven,** (Retaliating Against a Witness, Victim or Informant/Tampering with a Witness, Victim or Informant), **Twelve,** (Obstruction of Justice), **Thirteen,** (Criminal Facilitation/Murder), **Fourteen,** (Obstruction of Justice), **Fifteen,** (Criminal Facilitation/Murder), **Sixteen,** (Murder Conspiracy/Murder/Murder for Hire), **Seventeen,** (Murder Conspiracy/Tampering with a Witness, Victim or Informant), **Eighteen,** (Conspiracy to Engage in Unlawful Monetary Transactions), **Twenty-Three,** (Money Laundering), **Twenty-Four,** (Narcotics Conspiracy/Narcotics Distribution); **Count Four,** "Money Laundering" in violation of 18 U.S.C. §§ 1956 (a)(3)(B), and 3551 et seq.; **Count Five,** "Narcotics Conspiracy" in violation of 21 U.S.C. § 841 (a); 21 U.S.C. §§ 846, and 841 (b)(1)(B)(viii), and 18 U.S.C. § 3551 et seq.; **Count Six,** "Narcotics Distribution" in violation of 21 U.S.C. §§ 841 (a), and 841 (b)(1)(B), 18 U.S.C. §§ 2, and 3551 et seq.

2

## STATEMENT OF JURISDICTION

The United States District Court for the Eastern District of New York had original jurisdiction in this case pursuant to 18 U.S.C. § 3231, which provides in pertinent part, that "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the United States , of all offenses against the laws of the United States. ..." The United States Court of Appeals for the Second circuit had appellate jurisdiction in this case pursuant to 28 U.S.C. § 1291, which provides in pertinent part, that "The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District of Guam, and the District of the Virgin Islands, except where a direct review may be had in the Supreme Court. ..." The United States District Court for the Eastern District of New York once again had jurisdiction in this case pursuant to 28 U.S.C. § 2255, as did the United States Court of Appeals for the Second Circuit, pursuant to 28 U.S.C. § 1291. This Honorable Court's jurisdiction in this case is now being invoked pursuant to 28 U.S.C. § 2241.

## COGNIZABLE CLAIMS UNDER § 2255 MOTIONS AND § 2241 PETITIONS

A petition for habeas corpus under 28 U.S.C. § 2241 must be filed in the district of confinement. See *McQuiggin v. Perkins*, 133 S. Ct. 1924, 185 L. Ed.2d 1019 (2013). This Court has jurisdiction to hear a habeas corpus petition in this case under 28 U.S.C. § 2241 because it is the closest United States District Court to where the petitioner (hereinafter "Mr. Eppolito") is incarcerated. Notwithstanding the requirement that a habeas corpus petition under § 2241 be filed in the district of confinement, "[A] court must first determine whether a habeas corpus petition is filed pursuant to 28 U.S.C. § 2241 or 28 U.S.C. § 2255 before proceeding to any other issue." See *Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir. 2000) (per curiam). In making this determination, the Court must consider

3

1  whether the pending action comes within § 2255's "savings clause." The § 2255 "escape hatch" or

2  "savings clause," which provides that "[a] federal prisoner may file a habeas corpus petition under §

3  2241 to challenge the legality of a conviction" and/or [sentence] "when the prisoner's remedy under

4  § 2255 is 'inadequate or ineffective to test the legality of his detention." *Stephens v. Herrera*, 464 F.3d

5  895 (9th Cir. 2006). The petitioner has the burden of demonstrating Section § 2255 is "inadequate or

6  ineffective." *Redfield v. United States*, 315 F.2d 76, 83 (9th Cir. 1963).

7        The "inadequate or ineffective" exception is "narrow[,]" *Ivy v. Pontesso*, 328 F.3d 1057, 1059

8  (9th Cir.), cert. denied, 540 U.S. 1051 (2003); *United States v. Pirro*, 104 F.3d 297, 299 (9th Cir. 1997),

9  and the general rule...is that the ban on unauthorized second or successive petitions does not per se

10  make a § 2255 'inadequate or ineffective.'" *Stephens*, 464 F.3d at 898 (quoting *Lorentsen v. Hood*, 223

11  F.3d 950, 953 (9th Cir. 2000) (quoting § 2255)); see also *Ivy*, 328 F.3d 1059 ("§ 2255's remedy is not

12  'inadequate or ineffective' merely because § 2255's gatekeeping provisions prevent the petitioner from

13  filing a second or successive petition...." (Citation omitted)). However, "a motion meets the escape

14  hatch criteria of § 2255 'when a petitioner (1) makes a claim of actual innocence, and (2) has not had

15  an unobstructed procedural shot at presenting that claim.'" *Harrison v. Ollison*, 519 F.3d 952, 959 (9th

16  Cir. 2007) (citation omitted); *Stephens*, 464 F.3d 898; see also *Bousley v. United States*, 523 U.S. 614,

17  140 L. Ed.2d 828, 118 S. Ct. 1604 (1998). "'To establish actual innocence, [1] petitioner must

18  demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would

19  have convicted him.'" *Stephens*, 464 F.3d at 898. To determine "whether a petitioner had an

20  unobstructed procedural shot to pursue his claim, [the court asks] whether petitioner's claim 'did not

21  become available until after a federal court decision.'" *Stephens*, 464 F.3d at 898. That is, the Court

22  must consider: "(1) whether the legal basis for petitioner's claim did not arise until after he had

23

24        [1] But see *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (finding that "although petitioner did not

25  affirmatively prove his actual innocence, he met the miscarriage of justice standard, which required that he
    show that it was more likely than not that no reasonable juror hearing all of the available evidence would vote

26  to convict beyond a reasonable doubt, requiring a new trial.").

27

28                                              4

1  exhausted his direct appeal and first § 2255 motion; and (2) whether the law changed 'in any way

2  relevant' to petitioner's claim after that first § 2255 motion." *Ivy v. Pontesso*, 328 F.3d at 1060-61.

3        In *Persaud v. United States*, 134 S. Ct. 1023 (2014), the United States Solicitor General

4  significantly altered the government's previous position regarding the availability of a habeas corpus

5  petition under 28 U.S.C. § 2241. On December 20, 2013, the Solicitor General filed a Brief for the

6  United States supporting *Persaud's* petition, which sought Supreme Court review of the Fourth

7  Circuit's decision in a petition for a writ of certiorari. According to the Solicitor General, the view

8  that § 2241 is unavailable unless the petitioner can prove his actual innocence "is incorrect." The

9  Solicitor General viewed § 2241 as merely requiring that a petitioner "show a fundamental error in the

10  criminal proceedings." The Solicitor General then persuasively argued that there was no legitimate

11  distinction between challenges to convictions and sentences and that the limited construction given

12  to § 2241 was not supported by the language of 28 U.S.C. § 2255 or Congressional intent. Id. at p. 9.

13  Thus, courts had "erred in concluding that the savings clause does not permit petitioner to seek relief

14  under Section § 2241 purely because he challenges his sentence rather than his conviction. Sentences

15  that exceed the statutory maximum, or that impose a statutory mandatory minimum based on a legal

16  error [or unconstitutional statute], are cognizable under the savings clause." Id.

17        The petition for a writ of certiorari was granted, the judgment of the court of appeals vacated,

18  and the case was remanded for further proceedings in light of the position expressed in the

19  government's brief. Although the Supreme Court's [GVR Order] in the *Persaud* case has no binding

20  effect in any other case, it certainly signified the Court's belief that the newly adopted position taken

21  by the government on § 2241's availability was at least plausible.

22

23

24

25

26

27

28                                  5

# STATEMENT OF THE FACTS

## Procedural History

**On March 9, 2005,** following a lengthy investigation, Mr. Eppolito and Stephen Caracappa were charged in a multi-count indictment and subsequently arrested in Las Vegas, Nevada on the same day. In a series of superseding indictments, they were charged with participating in a racketeering conspiracy (**Exhibit B**) in violation of 18 U.S.C. § 1962 (d) of the Racketeering Influenced Corrupt Organizations Act (hereinafter "RICO"). The wide-ranging conspiracy described in the final superseding indictment (No. 1:05-00192-JBW (S-3)) was alleged to have begun in New York City in the early 1980s and continued in Las Vegas, Nevada until the date of Mr. Eppolito's arrest. It has been further alleged that the enterprise consisted of Mr. Eppolito, Stephen Caracappa and associates of organized crime-Frank Santoro, Jr.; Burton Kaplan; and Anthony Casso-and unnamed others. According to the allegations in the final superseding indictment, the members and associates of the enterprise sought to: Enrich members and associates of the Enterprise through assisting La Cosa Nostra ("LCN"), a nationwide criminal organization that engaged in, and the activities of which affected interstate and foreign commerce; That members and associates of the Enterprise sought to preserve, protect and enrich its members and associates by keeping victims and others in fear of the Enterprise and its members and associates through violence, intimidation, abuse of positions of trust and threats of violence. Alleged were seventeen predicate acts creating a pattern of racketeering activity. Fourteen of the acts-charges of murder conspiracy, murder, murder for hire, kidnaping, bribery, criminal facilitation, tampering with a witness, victim or informant, and obstruction of justice-alleged to have occurred in New York City between 1986 and 1991, while Mr. Eppolito and/or Stephen Caracappa were members of the New York City police department ("the New York acts"). Of the remainder ("the Nevada acts"), one act-conspiracy to engage in unlawful monetary transactions, charged against Mr. Eppolito alone-is alleged to have taken place in Las Vegas between 1994 and 1996. The final three racketeering acts-money laundering, conspiracy to distribute narcotics and

6

distribution of narcotics-occurred in Las Vegas in 2004 and 2005.  The last three Nevada acts were duplicated as substantive counts.  Mr. Eppolito was charged with money laundering in violation of 18 U.S.C. § 1956 (a)(3)(B).   Both Mr. Eppolito and Stephen Caracappa were charged with conspiracy to distribute and distribution of methamphetamine  in violation of 21 U.S.C. §§ 846, and  841 (a).

**On March 23, 2005,** Bruce Cutler filed his "Notice of Attorney Appearance" as counsel appearing for Mr. Eppolito.

**On April 21, 2005,** A plea of not guilty to all counts set forth in the indictment was entered on Mr. Eppolito's behalf.  A process that would be repeated following the First, Second, Third and final superseding indictment (S-3) filed in this case on January 26, 2006.

**On July 7, 2005,** at Mr. Eppolito's bail hearing, and again at an **August 9, 2005** status conference-concerns about the statute of limitations were raised by lead defense counsel [Bruce Cutler] which moved the court to press the government on the statute of limitations issue, emphasizing the apparently "thin" connection between the New York and Nevada acts. Tr. of July 7, 2005 Bail Hearing 65-69; Tr. of August 9, 2005 Status Conference 4-7.  At both the bail hearing and the status conference, the government maintained that it would be able to establish that the New York and Nevada acts were part of a pattern of racketeering activity and that, even if it were not able to establish such a pattern, it could avoid the statute of limitations problem by proving that Mr. Eppolito's involvement in the underlying conspiracy had continued beyond the statute of limitations bar.  At the August 9th conference, the court also inquired why the government had chosen not to charge Mr. Eppolito with the murders directly under 18 U.S.C. § 1958, or similar statutes that might apply without a statute of limitations bar.  The government stated that it was looking into a possible charge of murder under section 1958.  No such charge was ever brought, despite repeated superseding indictments.

**On October 25, 2005,** defense counsel moved to dismiss the racketeering conspiracy charge under Rule 12 (b) of the Federal Rules of Criminal Procedure on the ground that the government had failed to sufficiently allege the pattern or enterprise elements required by 18 U.S.C. § 1962 and that the government's failure to sufficiently allege the pattern element implicated the five-year statute of

7

limitations.  Although the court again emphasized the possibility of a statute of limitations problem

if the government's proof at trial failed to establish the continuation of the conspiracy after the time

of the New York acts, it denied Mr. Eppolito's motion to dismiss the charge.  Recognizing the

limitations of a criminal Rule 12 test of the facial sufficiency of an indictment, the court noted that the

validly composed grand jury had handed down a valid indictment in the case and concluded that the

case {436 F. Supp.2d 532, at 541}had to proceed to trial to permit the government to attempt to

support its factual theory. Tr. of December 1, 2005 motion hearing 37, 39-40.  Defense counsel also

moved to dismiss the substantive Nevada charges on the grounds that they could not be tried in the

United States District Court for the Eastern District of New York because of improper venue.  Defense

counsel waived their venue objection once the court indicated that it was denying their motion to

dismiss the racketeering charge.

**On March 8, 2006,** trial began with jury selection.  Opening arguments took place on **March 13 and 14, 2006**.  The trial lasted three weeks, with closing arguments on **April 3 and 4, 2006**.  The government's key witness was Burton Kaplan, a career criminal and former associate of the Lucchese crime family.  Having agreed to testify against Mr. Eppolito in exchange for leniency, Kaplan testified about the formation of the conspiracy and the New York acts.  Kaplan testified that his relationship with Mr. Eppolito and Stephen Caracappa began when Frank Santoro, Jr., Mr. Eppolito's cousin and a former fellow inmate of Kaplan's at Allenwood federal prison, offered to sell Kaplan confidential law enforcement information to be obtained by Mr. Eppolito and Stephen Caracappa, who at that time were New York City police detectives.  Kaplan claimed that he initially turned down Santoro's offer, but later contacted him and ask for help when, in 1986, he desired to have a criminal associate killed.  According to Kaplan, Santoro told him that he, Eppolito and Caracappa could carry out the murder contract.  At this point, Kaplan testified that he agreed to pay $25,000.  He then allegedly gave Santoro all of the information he had on the man he wanted killed, a jeweler named Israel Greenwald.  Kaplan, however, could not remember Greenwald's name, and throughout his testimony he referred to Greenwald as "jeweler number two."  Kaplan testified  that a short time after Santoro had made the

8

1   deal, he reported to Kaplan that Greenwald had been killed.  According to Santoro's alleged account
2   to Kaplan, he, Eppolito and Caracappa drove up behind Greenwald's car, turned on a flashing light
3   and pulled Greenwald over, telling him that they had to take him in for questioning regarding a hit and
4   run accident.  That after Greenwald agreed to accompany them, they took him to a garage in Brooklyn,
5   where Santoro shot him.  Kaplan testified that Santoro told him that he had disposed of Greenwald's
6   body and that neither Eppolito or Caracappa knew where the body was.  Kaplan admitted that at the
7   time of Greenwald's murder that he did not know Louis Eppolito, or Stephen Caracappa and that it
8   would be a few years after Greenwald's murder, and Santoro's murder in 1987 before he began dealing
9   directly with them, during which time they allegedly discussed the murder and Kaplan's payment.

10          According to the Government, Mr. Eppolito's and Caracappa's entry into a criminal enterprise
11   with Kaplan and Santoro was solidified when, in the fall of 1986, Anthony "Gaspipe" Casso, a "made"
12   member of the Lucchese crime family, was shot while sitting in a car in Brooklyn, eating an ice cream
13   cone.  Casso, an [allegedly] close associate of Kaplan's in a variety of criminal activities, survived the
14   shooting...and wanted revenge.  Kaplan claims to have told Casso about Santoro's law enforcement
15   source and then, at Casso's request, asked Santoro if Eppolito and Caracappa could obtain any
16   information about who was responsible for the shooting.  At the time, Mr. Eppolito worked in the
17   Sixty-Third Precinct, where Casso was shot.  According to Kaplan, Santoro subsequently delivered
18   a packet of information to him for Casso, stating that it was a "gift," and that Eppolito and Caracappa
19   would take no money for it.  Kaplan testified that he opened the packet and saw information on, and
20   a picture of, James Hydell; the names of Nicholas Guido and others; and law enforcement documents
21   regarding Casso's attempted murder.  Kaplan then testifies that he gave the packet to Casso, who
22   declared that he would try to kill the men who had been involved in the shooting.  Casso, according
23   to Kaplan, also said that he wanted to question James Hydell before he was killed, so that he could
24   find out who had ordered the attempt on his life.  Kaplan would go on to testify that he had informed
25   Casso of the Greenwald murder.  Then, at Casso's request, Kaplan claims to have asked Santoro if he,
26   Eppolito and Caracappa would take a contract to kidnap Hydell and deliver him to Casso.  Kaplan
27
28                                                     9

testified that Santoro agreed to accept the contract on behalf of all three men, and that Casso agreed to pay $35,000 dollars for the crime.  Having been promised (and later granted) substantial assistance under Rule 35 of the Federal Rules of Criminal Procedure,  Kaplan continued to implicate himself, Casso, Santoro, Eppolito and Caracappa as individuals involved in those crimes charged in the third (S-3) and final superseding indictment in this case.

On April 6, 2006, after a trial that lasted approximately three weeks, the jury returned verdicts of guilty against the defendants.  Expressing total dissatisfaction with trial counsel's performance during the trial, Mr. Eppolito immediately moved to dismiss Mr. Cutler as counsel, and later retained the services of trial-appellate counsel Joseph A. Bondy to perfect an appeal of the jury's verdict.

On June 23, 2006, after Mr. Eppolito had complained that Mr. Cutler had deliberately sabotaged his defense both before and during the trial in this case, the trial judge [Jack B. Weinstein] began a hearing to address Mr. Eppolito's claims.  A hearing that lasted approximately 2 ½ days.  At the close of the hearing, Judge Weinstein rejected Mr. Eppolito's claim that Mr. Cutler provided ineffective assistance of counsel.

On June 30, 2006, Judge Weinstein granted the defense's motion for judgment of acquittal, thereby vacating Mr. Eppolito's and Stephen Caracappa's RICO conspiracy conviction on statute of limitations grounds, pursuant to Fed. R. Crim. P. 29, and granted a retrial on any remaining counts due to prejudicial spillover.  The defense's motions for a new trial pursuant to Fed. R. Crim. P. 33, based on ineffective assistance of counsel were denied.

On September 17, 2008, following the government's appeal of Judge Weinstein's rulings, the United States Court of Appeals for the Second Circuit reversed the district court's judgment of acquittal and reinstated the RICO convictions.  See *United States v. Eppolito*, 543 F.3d 25 (2d Cir. 2008), cert. denied, *Eppolito v. United States*, 555 U.S. 1148, 129 S. Ct. 1027, 173 L. Ed.2d 313 (2009).

On March 9, 2009, Judge Weinstein sentenced Mr. Eppolito and Stephen Caracappa to life imprisonment.

1      **On July 23, 2010**, the Second Circuit denied Mr. Eppolito's and Stephen Caracappa's appeal

2   from the district court's denial of their Rule 33 motions for a new trial due to ineffectiveness of trial

3   counsel.  See *United States v. Caracappa*, 614 F.3d 30 (2d Cir. 2010).

4      **On October 21, 2011**, Mr. Eppolito by and through his attorney, Joseph A. Bondy filed his

5   motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255.

6      **On September 11, 2012**, the district court denied § 2255 relief in *Eppolito v. United States*,

7   Case No. 11-CV-5123 (E.D. N.Y.).

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ISSUES PRESENTED FOR REVIEW

### GROUND ONE:

**PETITIONER WAS DENIED THE RIGHT TO A FAIR TRIAL IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BASED ON...**

Structural/plain error - the result following the trial judge [Jack B. Weinstein] having found during a hearing on pretrial motions that Mr. Eppolito and Stephen Caracappa "were members of the conspiracy charged from the time it began until the time they were arrested."

## REASONS FOR GRANTING THE PETITION

In exercising its discretion, the trial court must be zealous to protect the rights of an accused. Every person charged with a crime is entitled to a presumption of innocence until his or her guilt has been proven beyond a reasonable doubt. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Williams v. Swarthout*, 771 F.3d 501, 509 (9th Cir. 2014) (quoting *Coffin v. United States*, 156 U.S. 432, 453, 15 S. Ct. 394, 39 L. Ed 481 (1895)). The Fifth Amendment's Due Process Clause guarantees a defendant the right to a "fair trial in a fair tribunal," *Withrow v. Larkin*, 421 U.S. 35, 46, 43 L. Ed.2d 712, 95 S. Ct. 1456 (1975), before a judge with no actual bias against the defendant or interest in the outcome of his particular case. See, e.g., *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821-822, 89 L. Ed.2d 823, 106 S. Ct. 1580 (1986); *Tumey v. Ohio*, 273 U.S. 510, 523, 71 L. Ed. 749, 47 S. Ct. 437 (1927); see also *Hurles v. Ryan*, 706 F.3d 1021, 1036-37 (9th Cir. 2013). [2] When, however, "a defendant's right to have his case tried by an

---

[2]   Hurles need not prove actual bias to establish a due process violation, just an intolerable risk of bias. *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825, 106 S. Ct. 1580, 89 L. Ed.2d 823 (1986); see also *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883, 129 S. Ct. 2252, 173 L. Ed.2d 1208 (2009) ("[T]he Due process Clause has been implemented by objective standards that do not require proof of actual bias.") (citing *Lavoie*, 475 U.S. at 825; *Mayberry v. Pennsylvania*, 400 U.S. 465-66, 91 S. Ct. 499, 27 L. Ed.2d 532 (1971); *Tumey*, 273 U.S. at 532).

impartial judge is compromised, there is structural error that requires automatic reversal." *Greenway v. Schriro*, 653 F.3d 790, 805 (9th Cir. 2011). Structural error transcends the criminal process by depriving a defendant of those "basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Arizona v. Fulminante*, 499 U.S. 279, 310, 113 L. Ed.2d 302, 111 S. Ct. 1246 (1991) (quoting *Rose v. Clark*, 478 U.S. 570, 577-578, 92 L. Ed.2d 460, 106 S. Ct. 3101 (1986)).

**On March 31, 2006,** while acting only as a paralegal in this case, Bettina Schein would again move the court to dismiss the charges set forth in the final superseding indictment (S-3), arguing that the government had failed to meet its burden of proof. Specifically, Ms. Schein argued...

> **"MS. SCHEIN**: Your Honor, pursuant to Rule 29, on behalf of Mr. Eppolito and Mr. Caracappa, the motion is to dismiss the charges for insufficiency as to all the counts in the indictment and, your Honor, based upon our pretrial motion and the government has failed to prove those elements as to the RICO conspiracy, the enterprise, the racketeering acts related thereto. And also on the basis of the statute of limitations, your Honor, we move to dismiss the charge in count one, and as to the remaining counts in the indictment, on the basis of the insufficiency we move to dismiss those counts at this time." T.T. p. 2889-90. See **Exhibit C.**

In response to the defense's motion(s), the court made the following ruling...

> **"THE COURT**: Thank you.
> Denied in whole as to all counts as to both defendants. Now, I made a number of rulings in connection with evidence issues. Some were objected to, most were not. For purposes of the hearsay rule and certain other rules, I find, and this is for evidentiary purposes only, not on guilt or innocence, that both these defendants were members of the conspiracy charged from the time it began until the time they were arrested, that statements that were admitted here by them or by others made as coconspirators, I won't unless counsel wish me to, mention all the coconspirators, were made in furtherance and during the course of the conspiracy. Do you wish me to mention the other members of the conspiracy?" T.T. p. 2890. See **Exhibit C.**

Further, during the joint-trial in this case, at which time defense counsel [Edward W. Hayes]

13

for Stephen Caracappa - was considering whether to call Anthony "Gaspipe" Casso as a witness for the defense, Judge Weinstein (while outside of the jury's presence) stated that...

> **"THE COURT**:   Then he is getting on the witness stand and he is going to be examined by you and when he is examined by you as a person who I have already determined is a coconspirator during a period of some 20 years with these two defendants, anything that he says in furtherance of that coconspiracy or that anybody said that he can tell about in connection with that coconspiracy will come in." T.T. p. 2915-16.  See **Exhibit C**.

Although the Constitution "guarantees a fair trial through the Due Process Clause," it defines "the basic elements of a fair trial largely through the several provisions of the Sixth Amendment." cf. *Strickland v. Washington*, 466 U.S. 668, 684-685, 80 L. Ed.2d 674, 104 S. Ct. 2052 (1984).  The Sixth Amendment guarantees the defendant the right to a jury trial, "which includes, 'as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of guilty.'"  *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S. Ct. 2078, 124 L. Ed.2d 182 (1993).  In the case at bar, Judge Weinstein's decision to admit evidence offered by the government during a hearing on pretrial motions was based on his finding that Mr. Eppolito and Stephen Caracappa "were members of the conspiracy charged from the time it began until the time they were arrested... ." T.T. p. 2890; **Exhibit C**.  However, "[n]o matter what the evidence was against him," Mr. Eppolito "had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535, 71 L. Ed 749, 47 S. Ct. 437 (1927).  Having predetermined Mr. Eppolito's guilt under the guise of "hearsay and certain other rules...for evidentiary purposes only" T.T. p. 2890, any presumption of innocence that Mr. Eppolito may have enjoyed following his arrest was short-lived and lost upon the court.  Even assuming that Judge Weinstein was capable of determining Mr. Eppolito's guilt for "evidentiary purposes only," the risk of bias [is] simply to great to ignore.  Again, Mr. Eppolito need not prove "actual bias" to establish a due process violation, just "an intolerable risk of bias." *Hurles v. Ryan*, 706 F.3d 1021, 1036-37 (9th Cir. 2013). Because Mr. Eppolito's allegation of judicial bias would, if proved, entitle him to federal habeas relief, this Court would abuse its discretion in denying this claim without an

14

1  evidentiary hearing.  See *Stanley v. Schriro*, 598 F.3d 612, 626 (9th Cir. 2008).

## ISSUES PRESENTED FOR REVIEW

### GROUND TWO:

### PETITIONER WAS DENIED DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION BASED ON...

Government's failure to disclose to the defense material exculpatory evidence in order to charge and convict Mr. Eppolito of crimes that the government knew  he did not commit.

## REASONS FOR GRANTING THE PETITION

The Fifth Amendment to the United States Constitution guarantees the right to a fair trial, and courts have "long interpreted this standard of fairness to require that criminal defendants be offered a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed.2d 413 (1984).  In order to protect this right, "[a] defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed."  *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed.2d (1963).  The prosecution, however, is obligated by the requirements of due process to disclose material exculpatory evidence on its own motion, without request. See *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 1565, 131 L. Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed.2d 481 (1985). Evidence is material and must be disclosed, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 115 S. Ct. at 1565; *Bagley,* 473 U.S. at 682, 105 S. Ct. at 3383.  A "reasonable probability" does not require

15

1   showing by a preponderance that the outcome would have been different. *Kyles*, 115 S. Ct. at 1565-66.

2   Rather, a "'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

3   *Bagley*, 473 U.S. at 682, 105 S. Ct. 3383.  Material evidence also required to be disclosed includes

4   evidence bearing on the credibility of government witnesses.  *Bagley*, 473 U.S. at 676, 105 S. Ct. at

5   3380; *Giglio v. United States*, 405 U.S. 150, 154-55, 92 S. Ct. 763, 766, 31 L. Ed.2d 104 (1972).  The

6   need for disclosure is particularly acute where the government presents witnesses who have been

7   granted immunity from prosecution in exchange for their testimony.  The Ninth Circuit has recognized

8   that criminals who are rewarded by the government for their testimony are inherently untrustworthy,

9   and their use triggers an obligation to disclose material information to protect the defendant from being

10  the victim of a perfidious bargain between the government and its witness.  See *Carriger v. Stewart*,

11  132 F.3d 463, 479-80 (9th Cir. 1997).

12          At issue is the government's failure to disclose material exculpatory evidence to the defense,

13  which effectively prevented defense counsel from establishing that Mr. Eppolito and Stephen

14  Caracappa were in no way involved with the murders of John "Otto" Heidel, or Anthony DiLapi, as

15  charged in "Racketeering Acts Eight and Thirteen" of the superseding indictment (**Exhibit B**, p.13,

16  18) filed in this case.   A fact that the government was well aware of when it elected to charge Mr.

17  Eppolito and Stephen Caracappa with those crimes under the RICO statute.  This is true because on

18  **May 15, 1996,** George Zappola and George Conte entered pleas of guilty (**Exhibit D**) to, inter alia,

19  multiple counts of murder, including, but not limited to, the murders of John "Otto" Heidel and

20  Anthony DiLapi in the case of *United States of America v. George Zappola and George Conte*, Case

21  No. CR-95-31 (FB),  out of the United States District Court for the Eastern District of New York,

22  Brooklyn Division. Despite its awareness of this fact, the government made no attempt to disclose this

23  information to the defense.  In fact, Mr. Eppolito did not become aware of these facts until 2014 when

24  he received a copy of the plea transcripts wherein Zappola and Conte enter their pleas of guilty to, inter

25  alia, the Heidel and DiLapi murders.  Documents that Mr. Eppolito received from Assistant

26  Cooperation Counsel Michael Chestnov, with the City of New York Law Department located at 100

27

28                                          16

1   Church Street, New York, NY 10007.

2          Mr. Eppolito argues that any statements made by George Zappola and George Conte regarding

3   their involvement in these murders, including, but not limited to, how the murders were committed,

4   why the murders were committed, who else was involved in the commission of these crimes, and how

5   they were able to locate the victims, are all relevant to the above referenced matters since those

6   statements may establish whether or not Mr. Eppolito and Stephen Caracappa played any role in these

7   homicides. Facts that the jury should have been allowed to consider before deliberations. Therefore,

8   this Court should order an evidentiary hearing to allow Mr. Eppolito the opportunity to further develop

9   this claim.

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ISSUES PRESENTED FOR REVIEW

### GROUND THREE:

**PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE
OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT
TO THE UNITED STATES CONSTITUTION BASED ON...**

Defense counsel's refusal to allow Mr. Eppolito to testify in his own
defense at trial, despite his repeated request to do so.

## REASONS FOR GRANTING THE PETITION

In all criminal prosecutions, the Sixth Amendment to the United States Constitution guarantee an accused the right "to have the Assistance of Counsel for his defence."   An accused right to be represented by counsel is a fundamental component of our criminal justice system, where lawyers are considered necessities, not luxuries. *Gideon v. Wainwright*, 372 U.S. 335, 344, 9 L. Ed.2d 799, 83 S. Ct. 792 (1963).  Their presence is essential because they are the means through which the other rights of the person on trial are secured.  Without counsel, the right to a trial itself would be "of little avail," *Powell v. Alabama*, 287 U.S. 45, 68-69, 77 L. Ed 158, 53 S. Ct. 55 (1932),  because "of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." *United States v. Cronic*, 466 U.S. 648, 653-654, 80 L. Ed.2d 104 S. Ct. 2039 (1984).   A convicted defendant  making a  claim of  ineffective assistance  of counsel  must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  In *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed.2d 674, 104 S. Ct. 2052 (1984), the Court adopted a two-part standard for evaluating claims of ineffective assistance of counsel.  First, "the defendant must show that counsel's  performance was deficient."  This requires

1   showing  that counsel made errors so serious that counsel was not functioning as the "counsel"

2   guaranteed the defendant by the Sixth Amendment.   Second, "the defendant must show that the

3   deficient performance prejudiced the defense."  This requires showing that counsel's errors were so

4   serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S.

5   at 687.

6

7   **A.    Mr. Eppolito's right to testify in his own defense**

8

9          The right of an accused to testify in his own defense is well established, and is a "constitutional

10   right of fundamental dimension," *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993), [3]  that must

11   be "unfettered," *Harris v. New York*, 401 U.S. 222, 230, 91 S. Ct. 643, 28 L. Ed.2d 1 (1971).   The

12   ultimate decision whether to testify rests with the defendant, and "only the defendant, not counsel, can

13   waive the constitutional right to testify."  *United States v. Gillenwater*, 717 F.3d 1070, 1073 (9th Cir.

14   2013).    A waiver of that right may not be implied from a defendant's silence at trial.   At trial,

15   defendants generally must speak to the court only through counsel, *Chang v. United States*, 250 F.3d

16   79,84 (2d Cir. 2001), and absent something in the record suggesting a knowing waiver, silence alone

17   cannot support an inference of such a waiver inasmuch as a waiver is an "intentional relinquishment

18   or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019,

19   82 L. Ed 1461 (1938).

20          On several occasions, both before and during the trial in this case, Mr. Eppolito informed

21   defense counsel Bruce Cutler and acting paralegal Bettina Schein of his desire to testify in his own

22

23   _____

24          [3]  See also *United States v. Gillenwater*, 717 F.3d 1070, 1077-78 (9th Cir. 2013); *Riggins v. Nevada*,
     504  U.S. 127, 144, 112 S. Ct. 1810, 118 L. Ed.2d 479 (1992) (Kennedy, J., concurring in the judgment)
25   (noting  that "[i]t  is well established that the defendant has the right to testify on his own behalf, a right we
     have  found essential to our adversary system"); *Rock v. Arkansas*, 483 U.S. 44, 107 S. Ct. 2704, 97 L. Ed.2d
26   37 (1987) ("A defendant in a criminal case has the right to take the witness stand and testify in his or her own
     defense.").

27

28                                             19

1    defense.  On each occasion, Mr. Cutler informed Mr. Eppolito that he would not allow him to testify

2    in his own defense and further refused to notify the court and government of his desire to do so.  Mr.

3    Eppolito believed then, as he does now, that had he been allowed to testify in his own defense, he

4    could have provided a wealth of information that would have allowed the jury to consider facts and

5    evidence that the government and its witnesses purposely chose to omit in order to convict him of

6    crimes that the government knew he did not commit.  Facts and evidence that Mr. Eppolito's own

7    attorney [Bruce Cutler] so arrogantly chose to ignore.  Having openly complained that Mr. Cutler

8    denied him, inter alia, the right to testify in his own defense, the court [Judge Weinstein] ordered a

9    hearing to be held on June 23, 2006 to address Mr. Eppolito's claims.  A hearing that lasted

10   approximately 2 ½ days.  During the hearing, at which time Mr. Eppolito testified (on June 23, 2006)

11   he was asked by his attorney [Joseph A. Bondy] whether he wished to testify in his own defense during

12   the trial in this case, to which he responded...

13

14                                    *        *        *

15

16   **TRANSCRIPT OF MOTIONS (June 23, 2006) Before the Honorable JACK B. WEINSTEIN,**
     **United States District Court Judge -** *United States of America v. Louis Eppolito*, **Criminal Case**
17   **No. 1:05-00192-JBW (E.D. N.Y.)**

18                                    **Eppolito-direct-Bondy**

19
     Q      MR. BONDY:        I want to ask you about the claim with respect to you wishing to testify
20                            in your own behalf, okay?

21   A      MR. EPPOLITO:     Yes, sir.

22   Q      MR. BONDY:        First off, did you wish to testify in your own behalf at trial?

     A      MR: EPPOLITO:     Absolutely, yes.
23
     Q      MR. BONDY:        Tell the court why.

24   A      MR: EPPOLITO:     I told Mr. Cutler that there were a lot of things in this arrest form that

25                            I was reading, and that I had access to from papers that I was seeing,

26                            that I could explain and that I believed that there was some sort of

27

28                                            20

| | | |
|---|---|---|
| | | underlying reason why I was picked and I was the person who was mentioned in these reports as being this despicable killer. |
| Q | MR: BONDY: | Did you want your voice to be heard?  What did you want, what did you expect from your testimony? |
| A | MR: EPPOLITO: | Yes.  I wanted to be heard.  I wanted the truth to come out.  I wanted the truth to be known. |
| Q | MR: BONDY: | Did you express this to your lawyer? |
| A | MR. EPPOLITO: | I believe that I not only expressed it, I almost - - belabored the situation, I kept on telling him, I got to get on that stand. |
| Q | MR. BONDY: | Let's start with the first time you spoke to your lawyer and go through the contacts that you can recall about wanting to testify.

Please tell the court, when was the first discussion that you recall having with Mr. Cutler about wanting to take the stand in your own defense? |
| A | MR. EPPOLITO: | When I was first arrested, I didn't know the reason, the charges - - I'm sorry about my throat - - I didn't know the reason for all the charges.  See **Exhibit E**, p. 12-13 - - |
| Q | MR. BONDY: | During the first discussion do you recall what Mr. Cutler's response to you was? |
| A | MR. EPPOLITO: | At one time he said to me - - as the case was progressing, if I feel that you need to take that stand, I'll put you on.

He mentioned words to me pertaining to how he thought the case would go, and I'm not an attorney so I don't understand a lot of it, and he mentioned the biggest problems and that those problems should take care of themselves. |
| Q | MR. BONDY: | What do you mean by that? |
| A | MR. EPPLITO: | Mr. Cutler felt that the statute of limitations was going to be strong in this case and that the case would then not be able to be substantiated.

I have to apologize the way I say it, but I said  to Mr. Cutler, I don't give damn about the statute of (**Exhibit E**, p. 14) (cont.)...

limitations, they're telling me that I killed people, that I kidnapped people.  I never did  any of that.  I want  to clear  myself  from every |

21

|    |   |                |                                                                                 |
|----|---|----------------|---------------------------------------------------------------------------------|
| 1  |   |                | single charge here.  I'm  not just worried of getting off on some legal         |
| 2  |   |                | technicalities.                                                                 |
|    | Q | MR. BONDY:     | Do you believe that if you were called to the stand in your own defense         |
| 3  |   |                | at trial that you would have been able to respond to a lot of the evidence      |
| 4  |   |                | that had come in?                                                               |
| 5  | A | MR. EPPOLITO:  | Yes, sir.                                                                       |
|    | Q | MR. BBONDY:    | Do you recall a second  communication that you had with your lawyer             |
| 6  |   |                | about your wish to take the witness stand?                                      |
| 7  | A | MR. EPPOLITO:  | Yes.                                                                            |
| 8  | Q | MR. BONDY:     | Would you tell us about that.                                                   |
|    | A | MR. EPPOLITO:  | During the week before the trial  was to begin,  I  was very  concerned         |
| 9  |   |                | about where Mr. Cutler was  going to take  the  case as my attorney.  I         |
| 10 |   |                | wanted to know where he was going to go with it.  His answers to me             |
| 11 |   |                | made no sense.                                                                  |
|    | Q | MR. BONDY:     | What do you mean?                                                               |
| 12 | A | MR. EPPOLITO:  | How are we going to fight this particular thing here?  He would say,            |
| 13 |   |                | Louie, how are we going to go about this?  What do you think here... ?          |
| 14 |   |                | See **Exhibit E**, p. 15.                                                       |

Mr. Bondy also questioned Mr. Eppolito about whether Mr. Cutler had informed him about his right to testify.  Specifically...

|    |   |                |                                                                                 |
|----|---|----------------|---------------------------------------------------------------------------------|
| 18 | Q | MR. BONDY:     | Did you ever at any time have a discussion with Mr. Cutler about how            |
| 19 |   |                | the right to testify was your right and your right alone?                       |
| 20 | A | MR. EPPOLITO:  | No.                                                                             |
|    | Q | MR. BONDY:     | The choice was ultimately yours and he could not override you?                  |
| 21 | A | MR. EPPOLITO:  | No.                                                                             |
| 22 | Q | MR. BONDY:     | Did there come a point in time where you asserted your wish to testify          |
| 23 |   |                | again?                                                                          |
| 24 | A | MR. EPPOLITO:  | Yes.                                                                            |
|    | Q | MR. BONDY:     | When was that?                                                                  |
| 25 | A | MR. EPPOLITO:  | During the trial.                                                               |
| 26 | Q | MR. BONDY:     | What was the response?                                                          |

| | | |
|---|---|---|
| A | MR. EPPOLITO: | There was some what I call flagrant lies told and I told Mr. Cutler that's a lie and I can prove that's a lie and I want to take that stand, and he looked over and says to me, You're not getting on that stand as long as I'm your attorney.  If you want another attorney you say so.   See **Exhibit E**, p. 16 - - **(End).** |

The following testimony is that given by defense/trial counsel Bruce Cutler on June 26, 2006.

\*          \*          \*

**TRANSCRIPT OF MOTIONS (June 26, 2006) Before the Honorable JACK B. WEINSTEIN, United States District Court Judge - *United States of America v. Louis Eppolito*, Criminal Case No. 1:05-00192-JBW (E.D. N.Y.)**

**Cutler-direct-Bondy**

| | | |
|---|---|---|
| Q | MR. BONDY: | Would you agree that a defendant has the right to presumption of innocence and a lawyer, right? |
| A | MR. CUTLER: | I don't know what you mean, Mr. Bondy. |
| Q | MR. BONDY: | Does a defendant in our system, in this temple of justice, have the right to a lawyer? |
| A | MR. CUTLER: | oh, sure. |
| Q | MR. BONDY: | And the presumption of innocence, correct? |
| A | MR. CUTLER: | oh, sure.  In fact, he had two lawyers. |
| Q | MR. BONDY: | would you agree that every defendant has a right to assist in their own defense? |
| A | MR. CUTLER: | Absolutely. |
| Q | MR. BONDY: | would you agree that that includes assisting in counsel's cross-examination of witnesses? |
| A | MR. CUTLER: | Sure. |
| Q | MR. BONDY: | The selection and preparation of defense witnesses? |
| A | MR. CUTLER: | Sure. |
| Q | MR. BONDY: | And the decision whether the defendant should take the stand? |
| A | MR. CUTLER: | Absolutely. |

23

| | | |
|---|---|---|
| Q | MR. BONDY: | You extended all of those options, those rights, to Mr. Eppolito? |
| A | MR. CUTLER: | Yes. |
| Q | MR. BONDY: | You allowed him to participate and assist you in the cross-examination of witnesses, when you had only two meetings (**Exhibit F**, p. 104) (cont.)... |
| | | during the course of the whole trial, sir? |
| A | MR. CUTLER: | No, I said two to three each week for three weeks, not counting the meetings that we had for months before. |
| Q | MR. BONDY: | oh, now it's two to three - - |
| | MR. HENOCH: | Objection. The lawyer is arguing with the witness. The lawyer should ask questions. |
| | THE COURT: | [sic] |
| A | MR. CUTLER: | They were short meetings, Mr. Bondy. Ten or twelve minutes at most, two or three times a week times three weeks. Lou sat with me before we went to court. Mr. Bondy, I don't need Lou to sit with me. He has a right to, it's his life and I was fighting for his life. We spent days, hours and weeks before we entered this court on March 6th to pick a jury, preparing this case for trial. |
| Q | MR. BONDY: | You may not have needed him to but you agree it was his right? |
| A | MR. CUTLER: | No question about it. |
| Q | MR. BONDY: | The same with the decision as to whether to testify? |
| A | MR. CUTLER: | No question. |
| Q | MR. BONDY: | Did you ever speak to Mr. Eppolito about testifying? |
| A | MR. CUTLER: | I think I told - - I don't recall it. I honestly - - and I'm smiling because it's so serious - - Lou may have and I said this, when we first were granted bail with the severe restrictions, we met at Ed Hayes's at 515 Madison Avenue and Lou went with me into Eddies office alone. He may have, may have mentioned, Do you think I'll have to testify. He may (**Exhibit F**, p. 105) have said it before he got bail, from jail. |

24

1
2
3
4

Mr. Bondy, I don't recall him ever saying it because - -
well, I just don't recall it and I would recall it. It never came up again.
It never ever ever ever ever came up again. I say it to you because
when you file the papers - - I was interviewed, I said maybe Lou
mentioned it early on. I said it was premature or I doubt it.

5
6
7
8
9
10

Once we have the 404(b) rulings, once we had the other
crimes in evidence, once Lou's book was dissected by me, once all the
tapes were played by me. If Lou wanted to testify - - I don't know if
I'm strong enough, I don't mean this literally, I would have tried to
tackle him to prevent it. I don't mean that literally, of course. I would
have strongly tried to dissuade him. In the strongest terms that I
could, Lou, you can't do it. But if he said I must I would have said all
right.

11
12
13
14
15
16
17
18

I would have asked the Court's permission to call Lou and, of
course, I would have asked for a continuance to work with him. I'd
need at least a full day. Judge Weinstein may have given me part
of a day. I would have gone through the charges with him, from
the indictment. I would have asked him whether he was guilty or
not guilty of them. I would have asked him about his relationship with
Kaplan. Asked him about his history with the police department.
Asked him about his family. Asked him about Casso, and then I would
have sat him down, and of course, put in the citations and metals that
he received as a detective. **Exhibit F**, p. 106 (cont.)...

19

Mr. Bondy, it never came up. It never came up.

| 20 | Q | MR. BONDY: | Therefore, would you agree with me that you never told him that the choice to testify is his and his alone? |
| 21 | A | MR. CUTLER: | Not in those words. I probably didn't say that. |
| 22 | Q | MR. BONDY: | You never told him that - - |
| 23 | A | MR. CUTLER: | Probably not in those words. I don't think that I have ever said that to anybody, but I may have. |
| 24 | Q | MR. BONDY: | You said to us under oath, the subject never came up? |
| 25 | A | MR. CUTLER: | I don't think it ever did. With Steve, yes. Not with Lou. |
| 26 | Q | MR. BONDY: | So then you'd agree you never talked to Louis Eppolito about how you |

27
28

25

| | | |
|---|---|---|
| 1 | | can't override his choice, right? |
| 2 | A   MR. CUTLER: | I wouldn't have worded it that way. |
| 3 | Q   MR. BONDY: | You never told him the right of his personal and fundamental - - |
| | A   MR. CUTLER: | No, I didn't say that to him.  No. |
| 4 | Q   MR. BONDY: | You didn't tell him that, ultimately, you can override me, did you? |
| 5 | A   MR. CUTLER: | I don't speak that way to clients, no.  See **Exhibit F**, p. 107. |

6
7
8       **THE COURT:**       I see  no point in cross-examination.   The witness  is  a  credible
9       witness.  He thoroughly prepared the case.  He conducted it in highly
        professional way.  He never told  this defendant  that he could not
        testify.  The defendant from  his long experience knew he could testify.
                 The defendant's excuse for not bringing it to the attention to the
10      Court is ludicrous. The defendant's immorality and lack of credibility
11      leads  the  Court to ignore his testimony on  any point that is relevant.
        This witness is excused.  You more than met the requirements of
12      Strickland in his defense.  The defendant received  an excellent defense.
13      See **Exhibit F**, p. 134 - - **(End).**

14

15           The  following  testimony  is  that  given  by  attorney  Bettina  Schein,  who  was  retained  by

16   defense/trial counsel Bruce Cutler - to act [only] as a paralegal during all proceedings related to the

17   United States case against Mr. Eppolito.

18                                        *          *          *

19   **TRANSCRIPT OF MOTIONS (June 26, 2006) Before the Honorable JACK B. WEINSTEIN,**
20   **United States District Court Judge -** ***United States of America v. Louis Eppolito*, Criminal Case**
     **No. 1:05-00192-JBW (E.D. N.Y.)**
21
                                        **Schein-Bondy/direct**
22
| | | |
|---|---|---|
| 23 | Q   MR. BONDY: | Good afternoon, Ms. Schein |
| | A   MS. SCHEIN: | Good afternoon. |
| 24 | Q   MR. BONDY: | How long have you worked for Mr. Cutler? |
| 25 | | See **Exhibit G**, p. 171 (cont.)... |
| 26 | A   MS. SCHEIN: | I don't work for Mr. Cutler. |

27

28                                            26

| | | |
|---|---|---|
| 1  Q | MR. BONDY: | Can you define your relationship? |
| 2  A | MS. SCHEIN: | I'm of counsel to him on certain cases. |
| Q | MR. BONDY: | How long have you had that relationship with him? |
| 3  A | MS. SCHEIN: | In the course of 16 years. |
| 4  Q | MR. BONDY: | You had that relationship on this case, correct? |
| A | MS. SCHEIN: | Correct. |
| 5  Q | MR. BONDY: | Mr. Cutler brought you into the matter? |
| 6  A | MS. SCHEIN: | Yes. |
| 7  Q | MR. BONDY: | To do certain things in the case? |
| A | MS. SCHEIN: | Yes. |
| 8  Q | MR. BONDY: | Those things include writing some of the motions, correct? |
| 9  A | MS. SCHEIN: | Writing all of the legal motions in the case. |
| 10  Q | MR. BONDY: | Doing all of the legal work. |
| A | MS. SCHEIN: | Yes. |
| 11  Q | MR. BONDY: | And Mr. Cutler was the trial guy? |
| 12  A | MS. SCHEIN: | Correct. |
| 13 | | See **Exhibit G**, p. 172 (cont.)... |

| | | |
|---|---|---|
| 14  Q | MR. BONDY: | Did you ever discuss with Mr. Eppolito the decision to testify? |
| 15  A | MS. SCHEIN: | Yes. |
| 16  Q | MR. BONDY: | Do you recall ever telling Mr. Eppolito that it was his right and his right alone? |
| 17  A | MS. SCHEIN: | No. |
| 18  Q | MR. BONDY: | Do you recall telling Mr. Eppolito that he shouldn't testify, correct? |
| 19 | | See Exhibit G, p. 174 (cont.)... |
| 20  A | MS. SCHEIN: | We had discussion prior to the commencement of the trial with regard |
| 21 | | to whether he should testify and I gave him my opinion that I didn't - - |
| 22 | | I thought the danger in him testifying would far outweigh any benefit. |
| Q | MR. BONDY: | And in the course of doing that, did you make it clear to him that |
| 23 | | Eppolito has a right to testify in his own behalf and that he is the only |
| 24 | | one that can exercise it? |
| 25  A | MS. SCHEIN: | No, I did not. |
| Q | MR. BONDY: | Did you ever hear Mr. Cutler do that? |
| 26 | | |
| 27 | | |
| 28 | | 27 |

1    A      **MS. SCHEIN:**        No, I did not.

2                                  See **Exhibit G**, p. 175. - -  **(End).**

3

———————————

4        A defendant's testimony can be crucial in any trial, and the Supreme Court has emphasized that

5    "the most important witness for the defense in many criminal cases is the defendant himself," *Rock*

6    *v. Arkansas*, 483 U.S. 44, 52, 107 S. Ct. 2704, 97 L. Ed.2d 37 (1987).  When a criminal defendant is

7    represented by counsel and openly expresses to counsel...his desire to testify in his own defense, the

8    Sixth Amendment requires that defense counsel notify the court and prosecuting attorney within a

9    timely manner.  If counsel fail or refuse to give such notice, the defendant is not only denied the right

10   to testify in his own defense but also his right to the effective assistance of counsel.  Thus, "[a]n

11   appellate court could not logically term 'harmless' an error that presumptively kept the defendant from

12   testifying." *Luce v. United States*, 469 U.S. 38, 42, 105 S. Ct. 460, 83 L. Ed.2d 443 (1984).

13       In the case at bar, and immediately after the close of Mr. Bondy's direct examination of Mr.

14   Cutler at the June 26th hearing,  Judge Weinstein made the following ruling...

15

16                "I see  no point in cross-examination.   The witness  is  a  credible
                  witness.  He thoroughly prepared the case.  He conducted it in highly
17                professional way.  He never told  this defendant  that he could  not
                  testify.   The defendant  from his   long experience knew he could
18                testify. The defendant's excuse for not bringing it to the attention to the
                  Court is ludicrous. The defendant's immorality and lack  of credibility
19                leads  the  Court to ignore his testimony on  any point that is relevant.
                  This witness is excused.   You  more than  met the requirements of
20                Strickland  in  his  defense.   The  defendant  received   an  excellent
                  defense." See **Exhibit F**, p. 134.

21

22       In reviewing Judge Weinstein's findings (**Exhibit F**, p. 134), it appears that  his decision to

23   immediately block the government's cross-examination of Mr. Cutler was intended to minimize (for

24   the government's benefit) the contradicting effects of Mr. Cutler's testimony.  **First**, is Judge

25   Weinstein's finding that "the witness is a credible witness."  A finding that is clearly not supported by

26   the transcript of the proceeding.  **Secondly**, is Judge Weinstein's finding that Mr. Cutler "thoroughly

27

28                                                      28

1  prepared the case," and "conducted it in a highly professional way." A finding that no [reasonable] trier
2  of fact could agree with after reviewing all of the evidence.   In fact, Mr. Cutler's defense of Mr.
3  Eppolito had been unorthodox from the very beginning to say the least, rising in crescendo from an
4  opening argument that attacked the "spiritual and moral cancer" that had descended on the mob to a
5  rambling summation that mixed references to everything from ducks to coyotes, from Crazy Horse,
6  the warrior chief, to "Bridge on the River Kwai." All of which...had absolutely nothing to do with the
7  trial in this case. **Thirdly**, is Judge Weinstein's finding that Mr. Cutler "never told" Mr. Eppolito "that
8  he could not testify."   In reaching this decision, Judge Weinstein chose to ignore 'the degree of
9  uncertainty' under which Mr. Cutler proffered his testimony regarding this issue.   For example, when
10 questioned by Mr. Bondy about whether Mr. Eppolito had informed him that he wanted to testify in
11 his own defense, Mr. Cutler responded by stating...

> "I think I told - - I don't recall it.  I honestly - - and I'm smiling because
> its so serious - - Lou may have and I said this, when we first were
> granted bail with the severe restrictions, we met at Ed Hayes' at 515
> Madison Avenue and Lou went with me into Eddies office alone.  He
> may have, may have mentioned, do you think I'll have to testify."
> (**Exhibit F**, p. 105)

16      A defendant's right to testify in his own defense is a constitutional right of fundamental
17 dimension that cannot be denied.  A right that no [competent] attorney would consciously choose to
18 bypass without first consulting his client.  Surely, this Court would agree that Mr. Eppolito's demand
19 to testify in his own defense...triggered a legal obligation requiring Mr. Cutler to give notice to all
20 parties in interest.  A requirement that Mr. Cutler blatantly chose to ignore.  Further, is Judge
21 Weinstein's finding that Mr. Eppolito's "immorality and lack of credibility leads the Court to
22 ignore his testimony on any point that is relevant. " A "finding" that ignores a very sound principle
23 regarding who is best suited to determine witness credibility.  A question the Supreme Court has
24 answered on more than one occasion.   In doing so, the Court has made clear that determining the
25 weight and credibility of witness testimony...has long been held to be the "part of every case [that]
26 belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical

29

1  knowledge of men and the ways of men." *United States v, Scheffer*, 523 U.S. 303, 313, 140 L. Ed.2d

2  413, 118 S. Ct. 1261 (1998) (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88, 35 L. Ed 371, 11

3  S. Ct. 720 (1891)). [4]

4      Judge Weinstein's attack on Mr. Eppolito's credibility necessarily calls into question his own

5  competence and credibility after having granted (on June 30, 2006) the defendants' "Motion for

6  Judgment of Acquittal" based on the defendants' claim that the indictment fell outside of the "statute

7  of limitations."    DN 380. [5]   A finding that is clearly at odds with his previous finding  that  Mr.

8  Eppolito and Stephen Caracappa "were members of the conspiracy charged from the time it began until

9  the time they were arrested... ," T.T. p. 2890 **(Exhibit C).**  A conspiracy that the government alleges

10 began in May 1979 and ended upon Mr. Eppolito's arrest on March 9, 2005.  **Lastly,** is Judge

11 Weinstein's finding that "the defendant received an excellent defense."    Again, a "finding not

12 supported by any transcript of the proceedings in this case.  In fact, Mr. Cutler became so fixated on

13 the "statute of limitations" issue that he chose to abandon far more viable forms of defense.

14      To that end, Mr. Eppolito respectfully submits that at no time did he waive his constitutional

15 right to testify in his own defense.   That had the jury been allowed to consider his testimony during

16 the trial in this case,  there is a reasonable probability that the government would have failed to meet

17 its burden of proving his guilt beyond a reasonable doubt.   For that reason, this Court should order

18 an evidentiary hearing whereby providing Mr. Eppolito with an opportunity to demonstrate why his

19 conviction(s) in this case must be vacated.

20

21

22

23

_____

24    [4] See also, *United States v. Barnard*, 490 F.2d 907, 913 (9ᵗʰ Cir. 1973) (The issue of credibility of

25 witnesses "is for the jury - - the jury is the lie detector in the courtroom.").

26    [5] "DN" refers to the Docket Entry Number.  See Exhibit A.

27

28                              30

# CONCLUSION

The government's case against Mr. Eppolito and Stephen Caracappa hinged mainly on the uncorroborated testimony of Burton Kaplan (the government's key witness), a career criminal who at the time of his testimony had everything to gain from his cooperation agreement with the government. Kaplan agreed to cooperate with FBI agents and other government officials involved in this case in 2004.   Kaplan's decision to cooperate would come approximately eight years after his arrest and conviction(s) in 1996 and 1997 for conspiracy, drug possession  and drug trafficking  charges for which he received a  27-year term of imprisonment in accordance with federal law.  In exchange for his cooperation and a plea of guilty in this case to a violation of the RICO statute, the government would move the sentencing court to grant Kaplan substantial assistance under Rule 35 of the Federal Rules of Criminal Procedure, which also included a reduction of the 27-year term of imprisonment that he had been serving prior to his cooperation agreement. A reduction of sentence that ultimately secured his release from prison soon thereafter.

A federal court is vested "'with the largest power to control and direct the form of judgment to be entered in cases brought up before it on habeas corpus.'" *Hilton v. Braunskill*, 481 U.S. 770, 775, 95 L. Ed.2d 724, 107 S. Ct. 2113 (1987) (quoting *In re Bonner*, 151 U.S. 242, 261, 38 L. Ed 149, 14 S. Ct. 323 (1894)).  Thus, this Court would be remiss in dismissing this case without affording Mr. Eppolito a reasonable opportunity to openly demonstrate why his conviction(s) in this case must be vacated.

**WHEREFORE**, Mr. Eppolito respectfully moves this Court to order an evidentiary hearing in this case.


Respectfully Submitted,


**LOUIS EPPOLITO**
Petitioner pro se

31

1

## CERTIFICATE OF SERVICE

2

3    I, Louis Eppolito, the petitioner proceeding pro se herein, do hereby certify that I have served

4    upon counsel for the Respondent, copies of the foregoing **Petition For A Writ of Habeas Corpus**

5    **w/Exhibits, pursuant to 28 U.S.C. § 2241,** by depositing same in the United States mail with First-

6    Class postage prepaid, addressed to the following.

7

8    **ELIZABETH STRANGE**
     United States Attorney
9    Office of the U.S. Attorney
     405 West Congress Street, #4800
10   Tucson, Arizona 85701-7300

11   **Counsel for Respondent**

12
     Dated this 2nd  day of July 2018
13

14

15
                                              Respectfully Submitted,
16

17                                   /s/   Louis Eppolito

18                                         **LOUIS EPPOLITO**
                                           Reg. No. 04596-748
19                                         U.S. Penitentiary Tucson
                                           P.O. Box 24550
20                                         Tucson, Arizona 85734

21                                         **Petitioner  pro se**

22

23

24

25

26

27

28                                     32

*LOUIS EPPOLITO*
*Reg. No. 04596-748*
*U.S. PENITENTIARY TUCSON*
*P.O. Box 24550*
*Tucson, Arizona 85734*

*July 2, 2018*

**BRIAN D. KARTH, Clerk**
**Office of the Clerk**
**United States District Court**
**405 W. Congress Street, Suite 1500**
**Tucson, Arizona 85701-5010**

*CV 18 - 0324 TUC RM EJM*

RE:   *Louis Eppolito v. R. L. Rhodes, Case No.* _____
       *Petition for a Writ of Habeas Corpus*          To Be Assigned By Court

*Dear Mr. Karth:*

*Enclosed for filing in the above styled case is petitioner's petition for a writ of habeas corpus w/exhibits, pursuant to 28 U.S.C. § 2241. I have enclosed the original and 2 copies of same, together with the necessary filing fee. I respectfully request that the Court provide me with a copy of the petition's front-page after which time it has received a time/file stamp and assigned a docket number.*

*Thank you most kindly for your time and assistance in this matter.*

*Sincerely,*

/s/ *Louis Eppolito*
*LOUIS EPPOLITO, Petitioner pro se*

*LE/*



RECEIVED
JUL 3 2018
CLERK'S OFFICE
U.S. DISTRICT COURT

*// Enclosures*